THE STATE *against* WILLIAM W. STEVENSON.

ON QUO WARRANTO.

Matters of fact set up in any pleading are upon demurrer regarded as admitted to be true ; and the simple question presented is, as to their legal sufficiency.

But it is facts only, and not inferences or deductions of the pleader, that are to be taken as true ; and such inferences or deductions, though improvidently or needlessly and improperly stated, are to be altogether disregarded as irrelevant and impertinent.

And an allegation that a particular law was in force at a particular time, is within this rule ; and is not a fact, the truth whereof is admitted by demurrer.

The statute approved March 3rd, 1838, concerning the office of Commissioner of Public Buildings, was not in force from and after its passage. Like other acts passed at that session, it did not take effect until the proclamation of the Governor.

This was a writ of *quo warranto*, sued out and prosecuted by the attorney for the State in the Supreme Court, by which the defendant was commanded to appear and answer unto the State of Arkansas, and show by what warrant he exercised the franchise of Commissioner of Public Buildings of the State of Arkansas, and had entered into, and upon, and used the powers, rights, and privileges, thereunto appertaining, it being alleged that no legal or valid grant of said franchise had ever been made to said *William W. Stevenson*, by and under the authority of said State.   To this mandate the defendant appeared and pleaded with a *profert* as his warrant for the exercise of said franchise, a commission issued by the Governor under the seal of State, countersigned by the Secretary of State, bearing date the 31st day of July, A. D. 1839, whereby he was in due form of law appointed and commissioned by the Governor, Commissioner of Public Buildings, " to fill the vacancy occasioned by the resignation of Samuel H. Hempstead," and authorized and empowered to hold said office during the time prescribed by law; that he had duly qualified as such Commissioner by taking the oath of office prescribed by law, which was endorsed on said commission, and that before entering on the duties of his said office he gave bond to the State with security in the penal sum of ten thousand dollars, conditioned in the manner prescribed by law, which had been approved by the Governor.

To this plea the State, by her Attorney, replied in substance, that she ought not, by reason of any thing by said Stevenson in his said plea alleged " to be barred from having her aforesaid writ against him, the said William W. Stevenson," because, she says, that by an act of the General Assembly of the State of Arkansas, approved March 3d, A. D. 1838, entitled, " an act providing for the appointment of Commissioner of Public Buildings," and which act was in full force from and after the said day of its approval, and thenceforward continued to be, and now is, a part of the law of the land, it was, among other things, enacted that there should be elected by the General Assembly, a Commissioner of Public Buildings, who should be commissioned by the Governor, and hold his office for the term of two years, and that the Commissioner appointed thereunder should hold the first term of his said office only until the end of the next session of the General Assembly thereafter: and that so much of an act of said General Assembly, approved the fourth day of November, A. D. 1836, as authorized the Governor to appoint a Commissioner of Public Buildings, should be, and the same was, by the act first aforesaid repealed: and the said State avers that at the next session of the General Assembly, after the passage and approval of the act first aforesaid, to wit: on the 11th day of December, A. D. 1838, the act first aforesaid being then in full force as aforesaid, at an election for Commissioner of Public Buildings aforesaid, held on said last mentioned day, in joint meeting by the two houses of the General Assembly aforesaid, under and by virtue of the act first aforesaid, in the Representative hall of the State of Arkansas, the President of the Senate and Speaker of the House of Representatives presiding, upon a joint vote of said two houses, taken in accordance with law, one *Richard C. Hawkins*, a citizen of the State of Arkansas, received a majority of all the votes so then and there given by said two houses, on joint vote, for said office of Commissioner of Public Buildings, he, the said Richard C. Hawkins, being then, and now, a citizen of said State, and then and thenceforward until this time, and now eligible to said office, and by law competent to hold the same, and receive, hold, have, and enjoy, all and singular the privileges, rights, and franchises, profits, salary, and emoluments, of said office; and he, the said

Richard C. Hawkins, was taken, and then, to wit: on said eleventh day of December, A. D. 1838, in the presence of said two houses of said General Assembly, in said Representative hall of the capitol of said State, declared by said Speaker and President to be duly elected Commissioner of Public Buildings of the State of Arkansas; and he, the said Richard C. Hawkins, then and there in manner aforesaid, was duly elected such Commissioner of Public Buildings for the term prescribed by law, to wit: for the term of two years from said day of said election, fully, to be complete and ended on the 11th day of December, A. D. 1840.

And the said State further avers that the said *office of Commissioner* of Public Buildings then was, and thence hath continued to be, and still is, the same office which the said William W. Stevenson hath, as in said writ alleged, intruded into and usurped; and she further avers that on the 17th day of December, A. D. 1838, the said Speaker of the House of Representatives and President of the Senate, issued, granted, and delivered, to the said Richard C. Hawkins, their certificate, in due form of law, as such Speaker and President, of his election as aforesaid, and right to hold the office aforesaid, and which said certificate of election was, by the said Richard C. Hawkins, on the 21st day of December, A. D. 1838, transmitted to, and came to, the hands of the Governor of the State of Arkansas; and further, that on the said day and year last mentioned, the said Richard C. Hawkins, together with two good and sufficient securities, made and executed their joint and several bond, in writing, in the sum, and with the condition, required by the act first aforesaid, in due form of law, and in conformity with the requisitions of the said act first aforesaid, as the official bond of said Richard C. Hawkins; and that the said Richard C. Hawkins, on the day and year last aforesaid, transmitted to said Governor his said official bond; and thereafter, to wit: on the 27th day of December, A. D. 1838, he, the said Richard C. Hawkins, filed said bond in the office of Secretary of State of the State of Arkansas, and that the said bond hath thence continued to remain, and still doth remain, in said office of said Secretary of State; and further, the said State avers that on said 27th day of December, A. D. 1838, the said Richard C. Hawkins, did take before Jesse Brown, Esq., an act-

ing Justice of the Peace in and for the county of Pulaski, the oath of office, by law by him required to be taken as such Commissioner, (he, the said Jesse Brown, being then and there, by law, authorized to administer the same,) and thereby accepted said office. And so the said State saith that the said Richard C. Hawkins did, on said 11th day of December, A. D. 1838, become, by the election aforesaid, Commissioner of Public Buildings for said State, for and during the full term of two years therefrom, to wit: until the 11th day of December, A. D. 1840: and thence hath continued to be, and now is in law, and by the law of the land, such Commissioner of Public Buildings, and that the said office hath not at any time since the said 11th day of December, A. D. 1838, hitherto been vacated, nor is it now vacated by said Hawkins, either by his own act, or by operation of law; and that said Hawkins hath not at any time since said 11th day of December, A. D. 1838, hitherto become, or been, nor is he now, ineligible to said office, or incompetent to hold the same; nor hath he at any time hitherto resigned, or yielded up the same, and so the said State saith, and avers it to be true, that when the said William W. Stevenson was so, as in his said plea alleged, appointed by said Governor, to the office aforesaid, to wit: on the 31st day of July, A. D. 1839, there was no vacancy existing in said office, but that the same was then in law held by said Richard C. Hawkins; and that the said appointment of the said William W. Stevenson was, when the same was so made, as in his said plea alleged, and still is, utterly null and void, and confers upon said William W. Stevenson no right or warrant to hold said office, or enjoy the rights, privileges, franchises and emoluments, thereof, and this the said State is ready to verify; wherefore, by her said attorney, she prays judgment, and that the said William W. Stevenson be ousted of the franchises aforesaid, &c.

The defendant demurred to this replication, and stated specially in his demurrer, as the ground thereof, " that it is not in the said replication alleged that the said Richard C. Hawkins, therein mentioned, ever obtained or had any commission from the Governor of the State of Arkansas to use or exercise the aforesaid office of Commissioner of Public Buildings."

The State, by her attorney, joined in demurrer, and after argument, the matters in law arising thereupon were submitted to the court.

WATKINS & HEMPSTEAD, for the respondent:

The defendant, in his pleading, has set out a commission from the Governor of the State, under seal, bearing date, to wit: on the 31st day of July, A. D. 1839, and it is not pretended that the person in whose behalf this *quo warranto* is sued out, ever had a commission for the same office.

The Constitution establishes the judicial co-ordinate with the executive department, and also with the Legislature. That one has no jurisdiction over the other is beyond doubt, and this principle is affirmed, if it required affirmance, in the decision of the case of *Hawkins vs. the Governor.* 1 *Ark. Rep.*

In that case it is expressly held that the Constitution assigns to the office of Governor no ministerial acts, and that the law can impose none—that if it does, their performance cannot be compelled. This is a necessary result from the nature of the powers with which the executive is clothed, that is, they are political, and therefore must necessarily possess a political discretion, for the use and abuse of which he is responsible, not to the judiciary, but in the mode prescribed in the instrument that confers that discretion upon him.

Each department has the right of judging and construing the Constitution for itself, according to the best lights they may have on the subject respecting the peculiar powers and duties conferred upon each, and the exposition of one, touching its own duties, cannot at all bind the other departments.

The decision of the Governor upon all legal and constitutional questions is final and conclusive, so far as regards the performance of his own duties, and the same principle applies to the other two co-ordinate departments. Hence, we respectfully contend that when an individual is once commissioned by the Governor acting under the Constitution, that the judiciary cannot inquire into the right of the commissioned individual to hold the office, much less into the claim of one who has no commission at all.

This may seem a bold position, but it is nevertheless sustained by principles deduced from the Constitution and countenanced by the decision of this court, to which reference has been made.

The Constitution in section 15, article 5, declares that "vacancies that may happen in offices, the election to which is vested in the General Assembly, shall be filled by the Governor during the recess of the General Assembly, by granting commissions which shall expire at the end of the next session."

The 13th section of the same article provides that "all commissions shall be in the name and authority of the State of Arkansas, be sealed with the seal of the State, signed by the Governor, and attested by the Secretary of State."

One section shows how and when an appointment is to be made, the other how it shall be evidenced.

The Governor determines upon this grant of power when a vacancy has happened, and makes an appointment, which is evidenced by the commission which he signs. It may readily be conceived that he may err, and that he may suppose a vacancy to exist, when, in point of fact, there is none. Yet what tribunal can gainsay his decision, or set it aside and declare that no vacancy has happened, and that the person commissioned shall not exercise the duties of the office to which he has been appointed? Each department possesses the right of judging of the Constitution for itself, and its decision is final as regards the performance of its own duties. 1 *Ark. Rep., Hawkins vs. the Governor.*

Of what utility is that right of judging if another branch of the government, equal only in power, could review the grounds upon which a decision is made, and declare that the facts necessary to support it did not exist, or that it is formed upon a mistaken apprehension of the Constitution? Can any principle be conceived more dangerous to the stability of the State government; more certain to destroy the equilibrium of power which supports and sustains the operations of each department?

The judiciary have solemnly disclaimed the exercise of any authority over the Executive. Yet what language could so forcibly speak the assumption of judicial supremacy, to gravely review, per-

34

haps, for the purpose of annulling, the exercise of constitutional pow-
er by the Executive? Would not his powers be a mere mockery, if
whatever he done in his political character might be rightfully an-
nulled by a co-ordinate tribunal? In vain have his constitutional du-
ties been defined and means extended to him to perform them, if
what he performs in his executive capacity is not to be considered as
matters *res adjudicata*.

Again, it is provided that each house of the General Assembly shall
judge of the qualifications, returns, and elections, of its own members.
*Sec.* 15, *Art.* 4. The right of thus judging is exclusive of every other
jurisdiction. Party spirit may disregard the dictates of justice and
law, and a person adjudged to be a member of either house, when it
is a notorious fact, evidenced by election returns, that his opponent is
the choice of the people, in whose person their most sacred privilege
has been audaciously violated. Yet where is the remedy? Where
can the disappointed aspirant for public honor obtain redress? Could
he apply to this court for a writ of *quo warranto* against his successful
adversary? If the writ was permitted to issue at all, could this court,
by possibility, judge between the qualifications of the two, investigate
the returns, and determine which was entitled to a seat, when the
power is exclusively vested elsewhere? Would this court dare to go
behind the vote of the house, as exhibited in the journal, to settle a
contested claim to a seat? Would a *quo warranto* be permitted to
issue when the judgment of this court could rightfully do nothing more
than affirm the decision of the house, and that too, upon the vote of
that house? Would this court gravely adjudicate that the person *who
was voted to be the sitting member was in reality so, as appeared by the
vote on the journal?*

Again, no person shall be a Senator who shall not have attained
the age of thirty years, who shall not be a free white male citizen of
the United States, who shall not have been an inhabitant of this State
one year, and who shall not at the time of his election have an actual
residence in the district he may be chosen to represent. *Sec.* 6, *art.*
4, *Const.*

What if one, or all, these qualifications should be wanting in the
person chosen as Senator, where would the right of investigating and

finally deciding reside? In the judiciary? No; it is a power not granted to that department, but expressly vested in another.

Under what clause of the Constitution—by what implication is it that either the executive or judicial branch can, in the slightest degree, interefere—in the remotest impair the decision of either house, as to the qualification of members, or as to the right of one to a seat which has been contested? By what exposition is it that a court, confessedly destitute of any authority to control or determine a matter in any way, is yet invested with the tremendous power of annulling the decision made on the same matter by a competent body—a decision, in its very nature, placed beyond the reach of co-ercion from any quarter? If, in these analagous instances, the judiciary would not, nay, could not, interfere by direct means, or indirect agency, we triumphantly ask how it can take a single step in investigating the facts of the present case, or at all events, go behind the commission pleaded by the incumbent of the office.

Is there any difference, in principle, between this decision made by the Governor as to a vacancy followed by a commission, and one that would be made by either house of the General Assembly as to the right of members to a seat? If the latter would be final and conclusive in every particular, what reason can be urged to exempt an exercise of the appointing power, under section 15, article 5, of the Constitution, by the Governor, from the same rule?

Will this court undertake to say that a vacancy did not exist in the office; and that, therefore, the Governor had no right to appoint? Shall his decision be reviewed when it is made in the exercise of a political constitutional power, and final and conclusive—indeed, can be reviewed in no other light than as a matter *res adjudicata* in every sense of the term, expressly declared so to be, by the spirit of that instrument? And yet the court must do this if it looks beyond the evidence of right exhibited by the respondent. Where is the substantial difference between exercising authority directly and boldly over the Executive, and annulling every act which he may perform in his political capacity? In both events the constitutional power of the Executive is at an end, and his independence, as the political representative of the State, is not more effectually prostrated, when he performs the

bidding of a court, than when that court sits in judgment on his conduct, investigates whether he has properly or improperly discharged his duties, and as a finishing stroke to this solemn farcical impeachment adjudges that he has done an act which is void, illegal, and unconstitutional. His functions could not be more effectually paralyzed by direct glaring usurpation, than by a judicial nullification of what he has done. Can it be supposed for a moment that the convention ever contemplated such a state of things—such a spectacle of clashing jurisdiction and governmental disorganization? If they did, how unwise, how foolish, not to have provided some mode by which collisions between the different departments might be adjusted. If the principle is once established that the decision or action of one department on a matter which appropriately belongs to it, may be reviewed and acted upon by another, such collisions must arise pregnant with danger to the perpetuity of the compact. Such a doctrine will never be judicially sanctioned.

Moreover, it is contended that no court will ever do an *idle or nugatory* act, or pronounce a judgment which cannot be executed. Suppose a judgment of ouster was given against the respondent, the person claiming the office would be put as far from obtaining the evidence by which he could rightfully exercise the duties of it as he ever was—we mean a commission. The court might declare that he was duly elected, but could not commission, and the judgment could be no substitute for that necessary evidence of official right, because the Constitution has prescribed a different kind to emanate from a different source. That all elective officers, whether civil or military, except bank officers, must be commissioned by the Governor before they can act, needs no argument or illustration—to mention it is sufficient. *Sec.* 13, *art.* 5, *Const.*

It is further contended that even on the facts of the case, the individual on whose behalf the writ is taken out is not entitled to the office; because, the law under which the election for a Commissioner of Public Buildings was held in 1838, was not in force.

It is a law of a *general, public, and permanent nature, without an enforcing clause,* and could not be considered in force until the issuance of the Governor's proclamation declaring that the Revised

Statutes were printed and ready for delivery, or by further legislation. *Rev. Code, p.* 699.

The election was held on the 11th day of December, 1838, when the only law in force vested the appointment of a Commissioner in the Governor. See act of November 4th, 1836, authorizing the sale of the five sections.

On the 13th of the same month an act to put in force an act entitled " an act providing for the appointment of Commissioner of Public Buildings, approved 3d March, 1838," was approved by the Governor, and such approval reported to the proper branch of the Legislature. This was therefore the first time that a valid election could be held for such an office. *Pamphlet Acts,* 1838, *p.* 95.

For the act thus put in force and improperly excluded from the Revised Statutes, see *Pamphlet Acts of* 1837, '38, *p.* 84; for the election, *vide House Journal* 289, 290.

On the 13th December, a resolution passed the House of Representatives declaring the election on the 11th null and void, by a vote of thirty-six to nine, which resolution was sent to the Senate, but not favorably acted on. *Vide House Journal of* 1838, *p.* 301.

No election was ever held afterwards, and the Legislature adjourned *sine die.* The Governor filled the vacancy in the office by appointment, as his constitutional duty required.

We are resisting a novel position—*that a valid election was held under a law when there was no law!*

Whatever the facts may be, we mainly rely on the principle that this court cannot step behind the commission to the respondent, that it furnishes evidence of his right to exercise the duties of the office which is now a subject of contest without hindrance or interruption from any quarter.

All of which is respectfully submitted.

PIKE, for the State:

In arguing the demurrer two positions are assumed by the respondent's counsel.

First, he contends that inasmuch as the power is given to the Governor, in case of vacancy in such an office, to fill such a vacancy by

appointment, this therefore is a constitutional duty imposed on the Governor in the exercise whereof it became necessary for him to decide whether a vacancy did or did not exist: and that as he has decided that question, his decision is final and conclusive, and cannot either directly or indirectly be reviewed in this court.

It is stated by the counsel that this position is not assumed with entire confidence, inasmuch as it is somewhat novel, and has never before been argued before a judicial tribunal.

It is not strange that the position assumed should lack even the pretence of confidence, for it amounts to no less than this, that the Executive is superior to all law, and that his acts, whether for good or evil, are not to be changed or examined *by any* tribunal whatever. It amounts to this: that if the Governor were to commission twenty individuals to different offices, in none of which existed a vacancy, these individuals must continue to exercise their respective offices, because the Executive, by commissioning them, has decided that a vacancy existed, and his decision is without appeal. It amounts to this: that if he were to-morrow to commission three men as Judges of the Supreme Court, the office of your honors would *ipso facto* cease, and you be no longer Judges. It amounts to this: that the Executive is the law, the realm, the State.

The gentleman admits, it is true, that if the Governor were to issue two commissions for the same office, to different individuals, this court could decide which was entitled to hold the office. But why make this concession? If his position be correct the Governor would equally decide in such case by issuing the second commission, that a vacancy existed as in a case where no commission had before issued, for, according to the argument, otherwise he would have had no power to issue the commission—by issuing it he decided that he had the power to issue it. *Ergo,* he decided that there was a vacancy, and his decision cannot be reviewed or reversed.

It is contended that the decision of the Governor upon all legal and constitutional questions is final, and conclusive, so far as regards the performance of his own duties: and hence it is contended that when an individual is once commissioned by the Governor, the judiciary cannot inquire into his right to hold the office. This the counsel

admits is a bold position, but he holds it to be sustained as well by principles deduced from the Constitution as from the decision of this court in *Hawkins vs. the Governor.* 1 *Ark. Rep.* 570.

That decision declares that each department possesses the right of judging the Constitution for itself, and that its decision is final as regards the performance of its own duties. From this he contends that where one department, say the executive, has decided a constitutional question, for another to review the grounds on which his decision was made, and declare that the facts necessary to support it do not exist, or that it is formed upon a mistaken apprehension of the Constitution, would be dangerous to the stability of the government, and destroy that equilibrium of power which supports and sustains the operations of each department. And then it is asked what language could so forcibly speak the assumption of judicial supremacy, as to gravely review perhaps for the purpose of annulling the exercise of constitutional power by the Executive? His powers, it is said, would be a mere mockery if whatever he did in his political character, could be annulled by a co-ordinate tribunal, and his constitutional duties have in vain been defined, and means extended to him to perform them, if what he performs in his executive capacity is not to be considered as *res judicata,* and as this court has declared that all his acts are political, whatever he does is irreversible and infallible.

If the opinion given by this court, in the case referred to, warranted these conclusions, God shield the State. If this argument be worth any thing, if it be any thing better than mere declamation, it goes to this extent, that when a Governor signs a law he declares it to be constitutional, because else, he would not have signed it; and, therefore, this being *res judicata,* this tribunal cannot declare it unconstitutional: that if the Governor were to-morrow to commission three individuals as Judges of the Supreme Court, he, by that act, declares your honors' seat to be vacant, and it is *res judicata,* not to be traversed or denied; that he can at any moment turn out every officer, military and civil, ministerial and judicial, merely by issuing new commissions, because he thereby decides those offices to be vacant, and it is *res judicata.* Oh, potent word! but potent only for the Executive. For although it is admitted that the Executive stands on the same ground

with the Legislature, yet no apostle of this new creed has ever re-flected that if the position be true, the Executive ought not to veto an act of the Legislature, because, by passing the act, they decide it to be constitutional, and it is *res judicata*. Nay, in this very case, when the Legislature elected the individual mentioned in the replication, and thereby declared the law providing for his election to be in force, it was *res judicata* according to the argument, and yet the Governor at-tempted to annul it by refusing the commission.

Into such and innumerable other absurdities would the position as-sumed conduct us. If it be true then, there is no Constitution, nor any settled rule of decision, but the department which first decides makes the law, and its fiat is irrevocable. It is manifest that the most glaring and monstrous absurdity would result, and the whole position is nothing but a hidious deformity embodied, unless it be at once allowed that the Executive is supreme, and when that department decides its decision is final, but that the same rule does not hold in regard to the other departments. For if you carry it out and apply it to each other department, inextricable confusion results, the government ceases to be a unity, and the first department which acts does all and leaves no-thing for the others to do. Even their concurrence becomes unne-cessary. The counsel contends that there is no difference between exercising authority directly and boldly over the Executive, and an-nulling an act which he may perform in his executive capacity, and that his functions could not be more effectually paralyzed by direct glaring usurpation than by a judicial nullification of what he has done. That is to say, by the same processs of words, for it cannot be called an argument, this court would do precisely the same act by de-claring a law unconstitutional as they would if they were to send their mandate to the Governor, ordering him not to sign it. The Governor would do the same act by vetoing a law as though he were to forbid the Legislature to pass it: and precisely the same act by refusing to commission a defaulter, as though he had forbidden the General As-sembly to elect him.

Let this court speak for itself, and say whether this strange and novel doctrine has been uttered by the supreme tribunal. "The Constitution," said this court, is above all the departments of the go-

vernment, for it creates and preserves them." "The writ asked for" said this court again, in the case of Hawkins, " does not proceed upon the ground that the Governor has done any illegal or unconstitutional act, but that he has refused to perform a legal or constitutional duty. *In the first case the court certainly has jurisdiction*, and in the *last* they unquestionably have not;" and again, " if he does an unconstitutional act, the judiciary can annul it and thereby assert and maintain the vested rights of the citizen."

This is intelligible language, and not the jargon and babble of confusion. It has a definite meaning easy to be ascertained, and when ascertained, consonant with reason and sound political doctrine. This court cannot compel the Governor, or the Legislature, *to do* any political act, because each department is invested with ample discretion to do, or leave undone, any such act, and with that discretion no other tribunal or department can interfere to coerce the action of the coordinate department. But when the discretion has been exercised, and the act done, if that act is brought in question before this court, or any other judicial tribunal, and the legality or constitutionality of the act presented to it for decision, then it is " of the very essence" of judicial duty and power to decide what the law is, and what the Constitution is; and if the act be void this court is bound by its oath of office to declare it so. The Executive has the right to decide for himself as to such matters, and this court cannot by its mandate compel him to decide at all, much less to decide against his own convictions; but when he has decided, his decision is liable to be reviewed here, and reversed if erroneous, and individual rights depend upon it; any other doctrine would be monstrous in its absurdity.

When before, for the last twenty years, has it been contended that the judiciary cannot annul the action of *both* the other departments, if unconstitutional? When, before this, was it ever argued that where an Executive commissioned a person to an office, a court of justice could not inquire whether that person was in law entitled to it?

The Governor, says the counsel, decides that there is a vacancy before he commissions. So, by the same argument, the Governor de-

cides that every person whom he commissions is legally elected and eligible to the office to which he commissions him, and therefore a *quo warranto* lies in no case where the omnipotent Governor has granted a commission.

He has, however, produced one instance in which this court could not interfere, and but one, and that is in case of the exercise by either house of the Legislature of the power to judge of the qualifications and returns of its own members. That, however, is an exclusive judicial power, conferred by the Constitution itself upon each House, and from which no appeal is granted. It is judicial in its nature, and exclusive: like the power of impeachment, and the judicial power imparted by the Constitution to the Senate for the purpose of trying impeachments.

But, in the matter of issuing commissions, no such exclusive power is given by the Constitution, nor does the right to any office depend upon the Governor's commission, but it is the duty of the Governor upon the election of any person to office to grant the commission.

The simplest answer, however, to the whole argument is, that although intended to be in support of, it is directly against the demurrer: for, if it is good for any thing, it proves just this position, that as the Legislature elected Hawkins, they thereby decided that the law creating the office was in force, and that he was eligible to it: and they having so decided, no other department, either the Executive or the Judiciary, could review or reverse that decision; and, therefore, as the replication which, by the demurrer, is admitted to be true, shows the law to have been in force, and Hawkins to have been eligible and legally elected, it was *res judicata*, and the Governor's subsequent decision, refusing the commission, was of no effect or avail.

That one department cannot annul the acts of another is a new position in political science. The author of it is entitled to its full benefit by the law of discovery. Has it ever been doubted that Legislative action could be annulled by the veto, and Legislative and Executive action jointly by judicial decision? That Executive action could be annulled by legislation withholding of supplies and unnerving the power of the sword by striking down the arm which wields it?

Has it ever been doubted that the Senate can annul Executive appointments, by refusing to sanction them, and that the Executive can annul Legislative elections, when the person elected is ineligible, by refusing to commission: or that the judiciary could do the same by a judgment of ouster on a *quo warranto?*

It is hardly necessary to refer to adjudicated cases to support a principle which plants so fixed a foot on the broad platform of common sense and political science. But it may be allowed to glance briefly at one or two.

In *Marbury vs. Madison*, the highest tribunal in the land decided, that to withhold a commission from a person entitled to it is an act not warranted by law: that the right to offices of trust, of honor, or of profit, is a vested legal right, entitled to the protection of the laws, and that *in every case* of the violation of a vested legal right, the law of the land affords a remedy to the injured individual.

In *Gould vs. Hutchins*, 1 *Fairfield*, 145, the Supreme Court of Maine directly annulled an act of the Governor, by which he disbanded a militia company under authority conferred by statute, on the ground that the facts furnished no sufficient basis for his action.

In *Bamford vs. Melvin*, 7 *Greely* 14, the same court decided that when a person held two commisssions, one as a Justice of the Peace, and one as Deputy Sheriff, his acts were void, certainly his commissions were thereby annulled.

The very question here presented to the court has been decided in the State of Alabama, in the *State vs. Adams*, 2 *Stewart*, 231, upon *quo warranto*. The person was returned elected by the casting vote of the Sheriff, and the Governor considering that the Sheriff had no right to give the casting vote, commissioned another individual under a clause in the Constitution authorizing him to fill vacancies, precisely similar to ours. The court divided on the question whether the Sheriff could give the casting vote; but it was conceded on all hands in the language of *Safford*, J., that " a commission does not confer the right to an elective office, except in case of vacancy, as directed by the Constitution: and that it is only evidence of the right which may be resisted, and either sustained or annulled according to the true result of the election." *Ib. p.* 247.

But, as was before remarked, it is not necessary for precedent or adjudication. The replication shows that there exists in Hawkins a complete existing *present* right to the office—that he was *legally* elected to it, was and is eligible and not disqualified, and has never resigned, vacated, or forfeited it. The State pleads his *right* to the office, the respondent rejoins that she does not set out the *evidence* of that right: for the commission is but the evidence, and there is no better settled rule of law than that when a title is well pleaded it is unnecessary to set out the evidence of that title. There is no question as to the title to the office, because, by the demurrer, all the facts stated in the replication are admitted to be true.

This court is sworn to decide what the law is, for that is the very essence of judicial duty. The counsel does not contend that Hawkins was not entitled to the office, nor that the Governor ought to have issued the commission to him. He raises no question as to the law on this subject, or the rights of the parties under the law, but claims that this court has no power or right to decide what that law is, or to adjudicate upon those rights, because another tribunal has already adjudicated.

And he further contends that this court will not decide because it would do an idle and nugatory act, and pronounce a *judgment* which could not be executed. How, an idle and nugatory act? If this court gives judgment of ouster can they not execute that judgment? Have they no power to compel obedience, and prevent the respondent from acting when they have decided that he has no authority to act? But he suggests that the person claiming the office would be just as far from obtaining the evidence by which he could rightfully exercise the duties of it as he ever was, to wit: a commission. That person is no party to this proceeding—nor interested, except incidentally, in the decision to be given. The court is called on by the State to oust a person who improperly holds an office, not to put in one who should be there. Of course the gentleman's argument has no bearing upon the case. It is true that the person entitled to the office is interested in the event of this case, and if decided as he claims it should be, he will know how, through the tribunals of the country to collect the sala-

The State *against* Stevenson.

ry which in law belongs to him, from those who have received it. So far the decision in this case will not be idle and nugatory.

It is not necessary to pursue this argument further. If the Executive of this State is armed with authority to displace every officer in the State, your honors included, to-morrow morning, by issuing new commissions to different persons, and thus arriving at absolute powers by this novel process of what the counsel call *adjudication*, then the demurrer will be sustained.

RINGO, *Chief Justice*, delivered the opinion of the Court:

The defendant, in support of his demurrer, insists that a commission from the Governor to Hawkins is indispensable to his legal right to enjoy, hold, and exercise the office in question; that he never having obtained such commission there was a vacancy in the office which the Governor possessed the legal and constitutional right to fill, notwithstanding his election thereto by the Legislature, as stated in the replication; and that the Governor, in the exercise of his constitutional power and duty, having determined the existence of a vacancy in said office, and proceeded to fill the same by appointing and commissioning the defendant, his authority derived therefrom cannot legally be questioned, controverted, or annulled; because the exercise of such power by the judiciary, or any other co-ordinate department of the government, must, in its consequences and effect, destroy the independence of the Executive, and divest that department of its constitutional powers; and upon these principles the defendant mainly, relies, but also denies that there was any law in force by which the Legislature was authorized to elect a Commissioner of Public Buildings when Hawkins was elected to fill that office.

These positions and principles are controverted by the attorney for the State, who insists that the matters as set forth in the replication and admitted by the demurrer to be true, conclusively show that there was no vacancy in the office in question when the defendant was appointed and commissioned thereto by the Governor, and therefore the Executive possessed no power whatever to make such appointment.

The matters of the replication pleaded by the State in avoidance of the warrant shown by the defendant, so far as they are well

pleaded, the law, in the present attitude of the case, regards as being admitted to be true, and the simple question of their legal sufficiency to avoid or invalidate the right exhibited by the defendant is presented for the consideration and judgment of the court. But it is facts only, and not inferences or deductions of the pleader therefrom, set forth in the pleading, that are to be taken as true; and such inferences and deductions, though imprudently, or needlessly and improperly stated, must, according to the uniform and well established principles of law and practice, be altogether disregarded as irrelevant and impertinent; and the allegation in the replication that the act of the Legislature approved March 3d, 1838, entitled " an act providing for the appointment of Commissioner of Public Buildings," was a law in force on the 11th day of December, A. D. 1838, when the Legislature elected Hawkins to that office, is, in the opinion of this court, embraced within this rule, and although positively averred, it must be regarded as an inference or conclusion of the pleader, rather than a matter of fact, necessarily and properly stated in the pleadings, because it is the province and imperative duty of the court to know the law, (and the law presumes every court to have a knowledge of all laws,) which of necessity includes a knowledge of the time at which the law commenced and took effect; for no enactment of the Legislature can be operative as law until such force is imparted to it in some method recognized or admitted by the Constitution or laws, existing at and previous to the time when it becomes obligatory as a rule of civil conduct.

And from the view which we have taken of the facts presented by the pleadings, we have no doubt, that it is our first duty to ascertain and determine whether the statute aforesaid, approved on the 3d day of March, A. D. 1838, had the obligation of law on the 11th day of December, 1838, when the Legislature elected Hawkins in the manner therein mentioned.

For it must, in our opinion, be conceded that if no such election was authorized by law, it must be regarded as an idle, inadvertent, and unauthorized proceeding, not vesting in the person who received the majority of votes, and was declared duly elected, any legal right to the office, which by law must have been filled by an Executive

appointment. The Legislature, like every other department of the government, is bound by the law, and if the law then in being vested the power of appointment to the office in question in the Executive department, no other department could in any manner legally make the appointment; and there can be no doubt that the Governor possessed the power of appointing the officer in question until the statute of the 3d March, 1838, took effect, which divested him of that right, and vested the power in the Legislature. This office is created by statute, and the Legislature possessed the power of abolishing it altogether, or directing by law in what manner it should be filled; this latter power had been exercised when the office was created, and the appointing power conferred upon the Governor, which it was his right and duty to exercise, until the law imposing that obligation upon him was repealed. That it is now repealed, and the power of appointment vested in the Legislature, there can be no doubt, but the question is when was it repealed? Every one must admit that the repeal was concurrent with the taking effect of the statute of the 3d March, 1838. But when did this statute take effect? By statute approved November 18th, 1837, and in force from that day, it is declared that "none of the statutes that may be passed during the present session of the General Assembly, shall take effect, and be in force, until the Governor shall issue his proclamation declaring that such statutes are printed and ready for delivery, *unless* a *different* day *shall be expressed* in the statute" and another section of the same statute declares that "it shall be the duty of the Governor, as soon as the statutes that may be passed during the present session of the General Assembly are printed, to issue his proclamation in accordance with the provisions of the preceding section." *Rev. Stat. of Ark.* 699.

That it was competent for the Legislature to prescribe the time when these enactments should take effect and be in force, as law, there can be no question, and that the time was prescribed by the statutory provisions above quoted; where no time is expressed in the enactments of that session, their taking effect is made to depend upon a contingent event in the future, that is, upon the issuing of a proclamation by the Governor, and to this rule there is but a single exception, and that

is where the time is expressed in the act.   This statute, in relation to the enactments of that session, abrogates the previous law on this subject, and prescribes a time different from, and inconsistent with the time previously prescribed by law; it establishes a new rule, but is not on that account less binding, and until it is repealed or superceded by some act of equal obligation, furnishes the criterion by which it must be determined when the statutes passed at that session acquire the efficacy and obligation of law; and such must be the case if the act is even to be regarded as of a local or temporary nature, because, under the provision of law above quoted the time at which the enactments of that session shall take effect does not, in any respect, depend upon the character of its provisions; whether they are of a public, general, and permanent nature, or of a private, local, and temporary nature, they are, we think unquestionably subjected to the same rule which, as before remarked, could only be modified, suspended, or abrogated by some act of Legislative authority possessing every sanction necessary to impart to it the force and obligation of law.   The act of the 3rd March, 1838, entitled " an act providing for the appointment of Commissioner of Public Buildings," and the act aforesaid, approved November 18th, 1837, were passed at the same session of the Legislature, and the rule prescribed by the latter expressly applies to and suspended the operation as law of the provisions of the former, until the contingency happened upon which they were to be enforced, upon the Governor's issuing his proclamation for that purpose, or the law suspending their operation was so far repealed by some subsequent act of the Legislature possessing the force and obligation of law, as to give them such force prior to and without the Governor's proclamation being issued, neither of which being done until the 11th day of December, 1838, (the day on which the replication alleged Hawkins was elected by the Legislature Commissioner of Public Buildings,) the statute in question, approved 3rd March, 1838, had not, on that day, acquired the force and obligation of law, and the election of Hawkins, by the Legislature, to fill that office, was inadvertent and illegal, and did not confer upon him any legal right whatever to the office he was so elected to fill, nor can the facts set forth in the repli-

The State *against* Stevenson.

cation, by any form of pleading them, avoid or invalidate the right exhibited by the defendant's plea, because they fail to show any legal incumbent of the office in question when the defendant was appointed thereto, and therefore the replication is, in the opinion of this court, insufficient in law to maintain the proceeding against the defendant.